# SUPREME COURT OF THE UNITED STATES

## DUANE EDWARD BUCK *v.* RICK THALER, DIRECTOR, TEXAS DEPARTMENT OF CRIMINAL JUSTICE, CORRECTIONAL INSTITUTIONS DIVISION

### ON PETITION FOR WRIT OF CERTIORARI TO THE UNITED STATES COURT OF APPEALS FOR THE FIFTH CIRCUIT

No. 11–6391.　Decided November 7, 2011

The petition for a writ of certiorari is denied.

Statement of JUSTICE ALITO, with whom JUSTICE SCALIA and JUSTICE BREYER join, respecting the denial of certiorari.

One morning in July 1995, petitioner Duane E. Buck went to his ex-girlfriend's house with a rifle and a shotgun. After killing one person and wounding another, Buck chased his ex-girlfriend outside. Her children followed and witnessed Buck shoot and kill their mother as she attempted to flee. An arresting officer testified that Buck was laughing when he was arrested and said "[t]he bitch deserved what she got." 28 Tr. 51 (May 6, 1997).

Buck was tried for capital murder, and a jury convicted. He was sentenced to death based on the jury's finding that the State had proved Buck's future dangerousness to society.

The petition in this case concerns bizarre and objectionable testimony given by a "defense expert" at the penalty phase of Buck's capital trial. The witness, Dr. Walter Quijano, testified that petitioner, if given a noncapital sentence, would not present a danger to society. But Dr. Quijano added that members of petitioner's race (he is African-American) are statistically more likely than the average person to engage in crime.

Dr. Quijano's testimony would provide a basis for reversal of petitioner's sentence if the prosecution were responsible for presenting that testimony to the jury. But Dr.

Quijano was a defense witness, and it was petitioner's attorney, not the prosecutor, who first elicited Dr. Quijano's view regarding the correlation between race and future dangerousness. Retained by the defense, Dr. Quijano prepared a report in which he opined on this subject. His report stated:

> "Future Dangerousness, Whether there is probability that the defendant would commit criminal acts of violence that would constitute a continuing threat to society? The following factors were considered in answer to the question of future dangerousness: statistical, environmental, and clinical judgment.

> "**I. STATISTICAL FACTORS**

>> "1. **Past crimes**. . . .

>> "2. **Age**. . . .

>> "3. **Sex**. . . .

>> "4. **Race**. Black: Increased probability. There is an over-representation of Blacks among the violent offenders.

>> "5. **Socioeconomics**. . . .

>> "6. **Employment stability**. . . .

>> "7. **Substance abuse**. . . ." Defense Exh. No. 1 in No. 699684 (208th Jud. Dist., Harris Cty., Tex.), p. 7.

The defense then called Dr. Quijano to the stand, and elicited his testimony on this point. Defense counsel asked Dr. Quijano, "[i]f we have an inmate such as Mr. Buck who is sentenced to life in prison, what are some of the factors, statistical factors or environmental factors that you've looked at in regard to this case?" 28 Tr. 110 (May 6, 1997). As he had done in his report, Dr. Quijano identified past crimes, age, sex, race, socioeconomic status, and substance

abuse as statistical factors predictive of "whether a person will or will not constitute a continuing danger." *Id.*, at 111; see also *id.*, at 110 (identifying the "statistical factors we know to predict future dangerousness"). With respect to race, he elaborated further that "[i]t's a sad commentary that minorities, Hispanics and black people, are over represented in the Criminal Justice System." *Id.*, at 111. Not only did the defense present this testimony to the jury but Dr. Quijano's report was also admitted into evidence— over the prosecution's objection—and was thus available for the jury to consider. See *id.*, at 233–234.

It is true that the prosecutor briefly went over this same ground on cross-examination. The prosecutor asked a single question regarding whether race increased the probability that Buck would pose a future danger to society:

> "Q. You have determined that the sex factor, that a male is more violent than a female because that's just the way it is, and that the race factor, black, increases the future dangerousness for various complicated reasons; is that correct?
>
> "A. Yes." *Id.,* at 160.

But this colloquy did not go beyond what defense counsel had already elicited on direct examination, and by this point, Dr. Quijano's views on the correlation between race and future dangerousness had already been brought to the jury's attention. Moreover, the prosecutor did not revisit the race-related testimony in closing or ask the jury to find future dangerousness based on Buck's race.

The dissent makes much of the fact that the State at various points in federal habeas proceedings was inaccurate in its attempts to explain why the present case is different from the others in which, as a result of similar testimony by Dr. Quijano, the State did not assert proce-

dural default and new sentencing proceedings were held.
But the fact remains that the present case *is* different
from all the rest. In four of the six other cases, see, *e.g.*,
*Saldano* v. *Texas*, 530 U. S. 1212 (2000), the prosecution
called Dr. Quijano and elicited the objectionable testimony
on direct examination. In the remaining two cases, see
*Alba* v. *Johnson*, 232 F. 3d 208 (CA5 2000) (Table); *Blue* v.
*Johnson*, Civ. Action No. 99–0350 (SD Tex., Sept. 29,
2000), while the defense called Dr. Quijano, the objection-
able testimony was not elicited until the prosecution ques-
tioned Dr. Quijano on cross-examination. See Record,
Doc. 511601677, at 44–49; *id.*, Doc. 511601676, at 39–44.
And, on redirect, defense counsel mentioned race only to
mitigate the effect on the jury of Dr. Quijano's prior identi-
fication of race as an immutable factor increasing a de-
fendant's likelihood of future dangerousness.* Only in

————————

 *On redirect in *Alba*, defense counsel tried to downplay the signifi-
cance of Dr. Quijano's testimony with respect to the statistical factors:

 "Q. [The prosecutor] asked you about statistical factors in predicting
future dangerousness. When we're talking about statistics, are we
talking about correlation or causation?

 "A. Oh. These statistics are strictly correlation. There's a big
distinction, and we must keep that in mind. Correlation simply says
that two events happened—coincidentally happened at the same time.
It does not mean that one causes the other.

 "Q. So when we're talking about these statistical factors—that more
men re-offend than women, Hispanics offend more than blacks or
whites, people from the low socioeconomic groups offend more than
people from the higher socioeconomic groups, people who have opiate
addiction or alcohol abuse offend more often than those who don't,
people who have less education offend more often than those who
have—do all those things cause people to offend?

 "A. No. They are simply contributing factors. They are not causal
factors. One cannot control one's gender or one's color. And obviously
there are many, many Hispanics, many whites, many Orientals who
don't commit crimes. But the frequence *[sic]* among those who commit
crimes, these are the characteristics. They don't cause each other; they
just happen to be coincidental to each other." Record, Doc. 511601677,

Buck's case did defense counsel elicit the race-related testimony on direct examination. Thus, this is the only case in which it can be said that the responsibility for eliciting the offensive testimony lay squarely with the defense.

Although the dissent suggests that the District Court may have been misled by the State's inaccurate statements, the District Court, in denying petitioner's motion under Rule 60 of the Federal Rules of Civil Procedure, was fully aware of what had occurred in all of these cases. It is for these reasons that I conclude that certiorari should be denied.

---

at 104–105 (one paragraph break omitted). See also *id.,* Doc. 511601676, at 82–84 (seeking to show that incarceration could decrease a defendant's likelihood of future dangerousness, notwithstanding the immutable factors, such as race); *id.*, at 82–83 ("If the person is put in a prison many of these factors will not be operative anymore because the prison restriction will not allow those factors to be present, and so the more of those factors are controlled by the prison structure, the less the danger—the less dangerous the person is in the prison").